UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CATHERINE DYAS,                                   * CIVIL ACTION NO.
  PAMELA CHARLES,
  *and*
  TIFFANY SNYDER

VERSUS                                            * JUDGE

CITY OF SHREVEPORT,
  CADDO PARISH COMMISSION                         * MAGISTRATE JUDGE
  SHREVE MEMORIAL LIBRARY
  MEMBERS "A," "B," & "C" OF THE
      SHREVE MEMORIAL LIBRARY
      BOARD OF CONTROL
  JOHN TUGGLE, EXECUTIVE DIR.,
      SHREVE MEM. LIBRARY
  JENNIE PAXTON, HUMAN RESOURCE
      COORDINATOR, SHREVE MEM.
      LIBRARY,
  CHRIS KIRKLEY, BRANCH MANAGER,
      SHREVE MEM. LIBRARY
  BANDANA MUKHERJEE, REGIONAL
      COORDINATOR FOR THE LIBRARY
  DEONCI SUTTON, ASSOCIATE DIR. OF
      PUBLIC SERVICES, SML

COMPLAINT WITH JURY TRIAL DEMAND

JURISDICTION AND INTRODUCTION

This is a Civil Action for declaratory, injunctive, and monetary relief brought pursuant to

42 U.S.C. Sections 1981, 1983, 1985 and 1986 under the Fourteenth Amendment to the United

States Constitution and  Title VII, 42 U.S.C. § 2000 et seq.    Plaintiffs also bring pendent state

law claims under LA Civil Code Article 2315 and L.R.S. Title 23 § 331 et seq.  and  L.R.S.

-1-

42§1169 (the "Whistle blower" statute.)     These claims stem from both sexual and racial discrimination which resulted in a hostile workplace environment  and eventually the retaliatory removal of each plaintiff from her desirable position to one clearly qualifying as an adverse move.  Each plaintiff filed a charge with the EEOC and each has obtained a "Right to Sue" letter dated  August 23,2016.  They timely file this lawsuit.

## PARTIES

A.  Plaintiffs are *Catherine Dyas*, *Pamela Charles* and *Tiffany Snyder*.  Each plaintiff is of full age of majority and resides in Caddo Parish, Louisiana.  They are and have been co-workers for years employed by Shreveport Memorial Library.  They are black Americans.

B.  Named as defendants and their respective capacities are:

1.  *City of Shreveport*, a political subdivision organized under the laws of the State of Louisiana, which can be served through its Mayor, Ms. Ollie Tyler;

2.  *Caddo Parish Commission*, a political subdivision organized under the laws of the State of Louisiana which can be served through its 2016 President, Matthew Linn.

3.  *Shreve Memorial Library*, an independent agency funded by the City of Shreveport and Caddo Parish, which can be served through its executive Officer John Tuggle;

4.  *Members A, B, and C of the Shreve Memorial Library Board of Control*, in their individual and official capacities, the government authority which voted to take adverse actions against the three plaintiffs. The individual members will be named once their identities are learned; They may be served through the Board President.

5. *John Tuggle*, is sued in his individual and official capacity as the Executive Director of Shreve Memorial Library;

-2-

6. *Jennie Paxton*, is sued in her individual and official capacity as the Human Resource Coordinator for the Shreve Memorial Library;

7. *Chris Kirkley*, is sued in his individual and official capacity as Manager of the Hamilton/South Caddo Branch of the Shreve Memorial Library;

8. *Bandana Mukherjee*, is sued in her individual and official capacity as the Regional Coordinator of the Shreve memorial Library.

9. *Deonci Sutton,* is sued in her individual and official capacity as the Associate Director Of Public Services of the Shreve Memorial Library.

STATEMENT OF BACKGROUND FACTS

1.

At all times relevant to this lawsuit plaintiffs were employees of the Shreve Memorial Library ("Library") assigned to the Hamilton/South Caddo Branch ("HSCB'); individually named defendants were at all times relevant to this lawsuit employees or agents of the Shreve Memorial Library or members of the Shreve Memorial Library "Board of Control which is the governing board of the Library.  The Library  is funded by defendants  the City of Shreveport and the Parish of Caddo, Louisiana.  The executive officer for each of those political entities sits as a member of the Board of Control.

2.

Shreve Memorial Library ("Library") consists of twenty separate branches throughout Caddo Parish.  The "main" facility or headquarters  is located in an historic landmark building on Texas Street in downtown Shreveport.

3.

The other nineteen branches are designated  "neighborhood branches." Two neighborhood branches offer extra services and are called "service centers."  Currently there are only two branches which operate as "service centers," the Broadmoor Branch and the Hamilton/South Caddo Branch.

4.

The Library employs both full-time and part-time employees.  These employees are divided into two sub-groups: exempt (those who don't have to "punch a time clock" and are salaried) and non-exempt (who do punch a time clock and who are paid by the hour.)

5.

There are many "perks" available to Library employees.  They include but are not limited to the following: (1) paid vacation days; (2) paid holidays; (3) paid sick leave; (4) medical coverage; (5) opportunity to join the Employees' Retirement System of the City of Shreveport; (6) opportunity to use the services of the Library's Employment Assistance Plan; (7) opportunity to take college classes with benefit of a tuition reimbursement program; and (8) other federally mandated benefits.

6.

The "Library" also classifies its employees as full-time or part-time employees.  There are approximately 250 employees currently in the Library" system.  Part-time employees work 39 hours or less per week.  They are eligible for only "selected" Library benefits.

7.

Certain of the Library branches are open on Sundays.  These working hours are not part

of a routine work schedule and are viewed as quite desirable "perks" which are awarded by supervisors as they choose.

8.

Positions in the "Library" system have specific job descriptions and prerequisites necessary to qualify for each such job.

9.

There is a written grievance procedure for employees to use if they believe they have been subjected to any form of discrimination while employed by the "Library."

10.

The Shreve Memorial Library Board of Control is the governing authority of the "Library." It is composed of members appointed by the Mayor and confirmed by the City Council and members appointed by the Parish Commission. There are also ex officio members.

**EVIDENCE OF RACIAL BIAS AND DISCRIMINATION GENERALLY IN THE SHREVE MEMORIAL LIBRARY SYSTEM**

11.

In the last fifty years much has changed in the Shreve Memorial Library system as a result of black Americans' demanding that their Civil Rights be recognized and protected. Laws and custom can no longer bar them from seeking jobs in the Caddo Parish "Library" system nor from using the facilities their tax dollars help support.

12.

Unfortunately despite these guarantees,  black residents of Caddo Parish are still subjected to a racial bias and discrimination within their Shreve Memorial Library system both as patrons and employees.

13.

Millions of dollars have been spent on the Caddo Parish Library system especially in building new facilities (branches) throughout the parish which are clearly located, staffed and funded based on the racial make-up of the separate communities and neighborhoods in which they are located.

14.

Branches in primarily black neighborhoods will be staffed by primarily black personnel and generally the services provided within those facilities will be significantly below the standard and quality of the branches in the predominantly white neighborhoods.

15.

The number of patrons using the services of the primarily black-staffed branches in primarily black neighborhoods is significantly below the numbers using the services in predominantly white -staffed branches in primarily white neighborhoods.  Black patrons can tell the differences and at times choose branches outside their neighborhoods.

16.

Local libraries are among the most segregated public meeting places in our parish and they most definitely are not equal in services provided.  Neither of the two large, "service centers" designated branches is located in or near predominantly black neighborhoods.

17.

There is significant disparity between the various Library branches both in their physical appearance and in the services they provide to their patrons.  These differences are also a reflection of the racial make-up of the neighborhoods in which they are located.

18.

There has never been a black manager or even an assistant manager in either of the larger "service center" branches or at the main branch/headquarters in downtown Shreveport.  Most employees in the branches located in predominantly black neighborhoods are black,  and the majority of employees at branches located in predominantly white neighborhoods are white

19.

Upper management of the Caddo library system continues to maintain and ensure that this separate and unequal standard in publicly- funded properties will last even as we move into the Twenty-First Century.

20.

Plaintiffs present the following inclusive but not exclusive examples of the way racial bias and racial discrimination continue to permeate the Shreve Memorial Library system:

a.  There has never been a black branch manager or assistant manager in either of the branches designated as a "service center" or in the "headquarters" located in the historic downtown main branch.

b.  Personnel records and witnesses will  show that black employees are denied the "fast track" pathway to "full-time" status enjoyed by the majority of white staff members even though many are similarly qualified.

c.  Black hourly (non-exempt) employees seldom enjoy the informal, "open-door" policy with upper- level management that their white co-workers enjoy. Therefore,  opportunities which lead to promotion and additional benefits based

on a personal relationship with the "managers" are denied to them.

d.    The Shreve Memorial Library operates a system which relies on retaliation to keep its personnel from making complaints of basically any nature, but especially of a nature that calls into play federal or state laws and/or regulations including the "whistle-blower" provision which they allude to in the Employee Handbook..

e    When  Shreve Memorial Library employees file complaints or grievances as a group in hopes of avoiding the expected retaliation, management utilizes a "divide and conquer" plan.  Any investigation that does take place will be done under the utmost secrecy on a one-on-one basis followed by a demand that each employee will maintain absolute confidentiality about anything said during his/her particular interview.  Any report that MAY follow will not mention any basis for that decision, only that a decision has been made and the action to be taken..

f.    When upper management hires a new member of "their management team," they expect that person will conform to the practices currently in place regardless of legal or moral correctness of those practices.  If the new hire fails to comply, retaliation will follow rather quickly with some adverse employment action usually  resulting in the employee either being fired or choosing to resign.

g.    Discipline and privileges are imposed and/or handed out based on an employee's race.

## SPECIFIC INSTANCES OF RACIAL BIAS AND DISCRIMINATION COMMITTED BY DEFENDANTS PRIOR TO 2016

22.

While plaintiffs do not seek damages for complaints made by themselves and others years before the facts of their EEOC charges occurred, they believe it is important to include mention of some earlier instances in order to understand the seriousness of their retaliation claim.

a.    In the 2007-2008 time period there was an uprising of sorts by employees at the West Shreveport Branch.  The problem stemmed from allegations of abuse by Annie Harville, a white female part-time "tech" employee who alleged she had been threatened with bodily harm and otherwise discriminated against  by black co-workers because of her race.  Plaintiffs have a copies of voluminous documents stemming from the resulting investigation.

b.    This investigation took place while Jim Pelton was the Executive Director. Ms. Jill Byttner had recently been hired as the Assistant Director and she took on

the responsibility of investigating the serious allegations.  When her investigation began to reveal there was no truth to the allegations, she was ordered to step down and let Jennie Paxton in Human Resources (who at the time was a subordinate of Ms. Byttner and who was to take orders  from Ms. Byttner) take over the case.

c.    Helen White staff member at the West Shreveport Branch was joined by four other employees at WSB in calling the situation at that center "a serious indictment on our intelligence when we witness what appears to be racism in its ugliest form in our workplace."

d.    Ms. Byttnner's report to her boss, Director Pelton, indicated things were so out of control at the many branches that the people are desperate.  She noted that the HSCB was another branch where employees had just about given up in believing they would get relief from the hostile working environments in which they labored.  She specifically mentioned Catherine Dyas and Pam Charles at HSCB who were so distraught they had begun mental health therapy just to be able to continue coming to work.

e.    Ms. Byttner called the working situations and the lack of relief coming from management as unethical.  She called the current administrative group a de facto personnel system operating outside of the rules set forth in the Employee Handbook.

f.  Board of Control member Gail Griffin seemed to be the only person besides Ms. Byttner who was willing to consider as truthful the arguments of those employees alleging abuse at their workplaces.

g.  It will later become relevant that after many months of stressful investigations, Ms. Harville's allegations that she suffered from racial discrimination at her workplace and was threatened with actual physical violence were found to be totally unsubstantiated.  Inexplicably, she was not fired, but instead was moved to a similar position at the Hamilton/South Caddo Branch where she continued to attempt to create unrest and  foment racial conflict at a branch which had not been known for any such problems.  Black employees at the West Shreveport Branch continued to be subjected to racial discrimination.  Ms. Byttner left the SML system.  Director Pelton resigned his position.

**SEXUAL HARASSMENT PERPETRATED BY CHRIS KIRKLEY WHILE BRANCH MANAGER AT THE HAMILTON SOUTH CADDO BRANCH AND HOSTILE WORK ENVIRONMENT CLAIM**

23.

Chris Kirkley is a white male who garnered the favor of upper management while he worked in a non-supervisory position in the Main Branch in downtown Shreveport.  While having little ( if any)  management experience during his years with the Caddo Library system, in May 2013 he was promoted to the highest management position at a branch designated as one of the two "service centers."  At that time he did not meet the required qualifications for that spot. Others whose requests to apply were denied, were much more qualified academically and experience- wise.  Nevertheless,  Mr. Kirkley received the promotion.

24.

Chris Kirkley was part of the upper level management cabal which over the past ten years was and which continues to be in control of the Shreve Memorial Library system regardless of who the Executive Director might be-- and especially during those many months when there was no Executive Director due to the unexpected resignations of  Directors for reasons never fully explained to the public.

25.

Upon receiving his new position in May 2013, Chris Kirkley almost immediately focused his attention on one particular employee at the HSCB–Tiffany Snyder, a young black woman who had been in the Caddo library system since her college days in 2005, and who in 2013 served as the supervisor of the Childrens'  Department.

26.

Tiffany Snyder was in 2005 and is today a quiet, introspective, highly self-motivated young woman who aspires to ascend the ranks in a  first class library system.  She began

employment with the SML as a part-time, lowly "tech" in 2005 at the West Shreveport Branch. She worked her way up to be supervisor of the Childrens' Department at the Hamilton/South Caddo Branch shortly before Mr. Kirkley's arrival.

27.

A young, single woman, Ms. Snyder initially enjoyed the attention the new branch manager lavished on her. But within a short period of time, she began to feel uneasy by the frequency and nature of his attention.

28.

Chris Kirkley seemed to develop what can at best be described as an unprofessional and inappropriate compulsion to constantly monitor Ms. Snyder's every move. At worst, Chris Kirkley's behavior could be described as "stalking" Ms. Snyder during the entirety of her workday.

29.

Tiffany Snyder discussed her concerns with friend and confidante Pamela Charles who was the only other employee designated as a department supervisor at the HSCB. Ms. Snyder told Ms. Charles how uneasy she was with Mr. Kirkley's practice of isolating her from other branch personnel in her office. Sometimes he would close the door and even close the blinds to her office windows. If she had been busy working at her desk prior to his entering, he would at times just sit and watch her–not saying a thing. It was disconcerting to say the least. Other times he would approach her and compliment her on her perfume or her hair or the outfit she happened to be wearing that day. These incidents became more frequent and lasted longer and

longer–sometimes for several hours.

30.

Ms. Snyder did nothing to encourage these closed-door sessions with her branch manager, but was unsure exactly what steps she should take to discourage them.  She was well aware of his connections with upper management and she worried about the likelihood of retaliation if she made any complaints.  Nonetheless, she was becoming increasingly troubled by Mr. Kirkley's conduct as the months went on.  Ms. Snyder next shared her concerns first with Catherine Dyas who was the first assistant to Pamela Charles.  The three black women, though a generation apart in age, all were well aware of the racism and retaliation which permeated the SML system.  They knew any rash move on their part could mean their termination.

31.

Tiffany Snyder decided to take a chance and next enlisted the help of HSCB assistant manager, Barbara Skains who was already well aware of the bizarre and inappropriate behavior of their branch manager toward Ms. Snyder.  By that time it was in fact a topic of gossip not only at the HSCB but throughout the Library system.

32.

By April 2014 Tiffany Snyder had made it clear to Chris Kirkley that she would no longer tolerate his confining her to her office with the door closed as well as the other embarrassing behavior to which he subjected her.   Mr. Kirkley was unhappy with Ms. Snyder's rebuff.  He advised all HSCB staff members they were to watch each other and to report to him if they observed any wrongdoing on the part of any employee.  Tension at the workplace increased.

33.

On August 13, 2014, Tiffany met with Mr. Kirkley in his office to discuss the behavior of middle school students who would use the library after school hours and sometimes on a field trip.  These were primarily black students who attended Ridgewood Middle School across the street from the library.  It was  clear to his staff that he did not enjoy having them on the premises.  During the meeting Mr. Kirkley seemed to become angry, his voice became louder, his body language became aggressive.  After several minutes he slammed his fists down on his desk.  Ms. Snyder immediately left his office in tears.

34.

Co-workers Pamela Charles and Catherine Dyas were in an adjacent room and overheard the exchange. They comforted Ms. Snyder who was unable to even continue working at that point.

35.

On August 28, 2014, Mr. Kirkley came in to Ms. Snyder's office and stated he had been looking all over for her but had been unable to find her.  He suggested he might need to put a bell on her in the future.  She was humiliated by the comment.

36.

On September 24, 2014, Mr. Kirkley pulled Ms. Snyder into the stacks to discuss giving one of the low level "techs" more work hours.  Other staff members observed this and knew this was something that should have been addressed in an email to all department heads and not in the stacks to only her.

37.

On October 1, 2014, Ms. Snyder had a meeting with Mr. Kirkley as witnessed by Ms. Skains and Pamela Charles. They discussed once again the fact that the branch had become a place of hostility due to his lack of professional conduct. He promised to do better. However, what little improvement there was, was short lived.

38.

Barbara Skains made notes before and after that meeting. She noted beforehand that "Tiffany was in an extremely fragile state (crying openly), and felt that she needed the support of Pam and I to get through the meeting with Chris Kirkley." In conclusion she noted: "There had been increasing tension and stress at Hamilton/South Caddo over the last year or more, since Chris Kirkley obtained the position of Branch Manager. Staff feels as if they are being watched constantly to see if they are doing something wrong." She added that she had been told that Chris Kirkley had specifically asked staff during a circulation staff meeting to report other staff members if they saw anyone doing something "wrong." She felt that asking staff to "tattle" on one another does not promote good staff morale, which is at an all-time low at HSCB right now as it is.

39.

Tiffany Snyder and her two black female friends/co-workers (plaintiffs herein) united in an effort to support one another in the ever-increasing hostile environment. Tiffany was on the verge of having a nervous breakdown. Pamela and Catherine were both beginning to suffer as well. Chris Kirkley began referring to them as "the group." Pamela and Catherine began to suffer repercussions of their own for supporting Tiffany and defending her from the slanderous

allegations heard about their workplace.  The three black women, two of whom were the only department supervisors at the branch, began to suffer physical and mental health problems.  They were shunned by many of their co-workers at the branch and in the parish-wide system with whom they had been friends for yeas.  Coming in to work each day was a challenge knowing the hostility they would face.  Their ability to perform their jobs was impaired.  At times they were actually forced to go outside into the parking lot for their breaks  to get relief from the abuse of Chris Kirkley.

**ACTIONS TAKEN BY THE PLAINTIFFS
IN  RESPONSE TO THE HOSTILE WORK ENVIRONMENT
CREATED BY MANAGER KIRKLEY'S
SEXUAL HARASSMENT OF TIFFANY SNYDER**

44.

As noted above, Tiffany Snyder first sought guidance and support from co-workers Pamela Charles and Catherine Dyas.  She then sought the help of the branch's assistant manager Barbara Skains. At the urging of the assistant branch manager Barbara Skains, Tiffany Snyder took her complaints to upper management.   On November 7, 2014 Ms.  Snyder and Ms.  Charles prepared a complaint addressing their issues with Chris Kirkley.  They perceived the situation at their workplace as a combination of sexual harassment and racial hostility which had resulted in a hostile work environment.  Plaintiffs asked to meet privately with the Library's Regional Coordinator, Bandana Mukherjee.  Their request was granted in part.  They met with Ms. Mukherjee, but Mr. Kirkley was also present.  There was no resolution to the problem and tensions at the workplace increased.

45.

On December 2, 2014, Barbara Skains, Assistant Branch Manager at HSCB sent an email confirming an upcoming meeting she had requested on behalf of the plaintiffs herein.  Those to be present  including herself, were Catherine Dyas, Pamela Charles, Tiffany Snyder, Deonci Sutton (Public Services Coordinator) and Beverly Rogers set for December 5th.  She also prepared a 6-page document in preparation for the meeting.

46.

The December 5th meeting was held as planned but with the addition of Chris Kirkley's presence which the petitioners had specifically requested not happen.

47.

Ms. Skains noted that by the October 1, 2014 meeting Tiffany Snyder was in an extremely fragile state (crying openly) and felt she needed the support of Pam Charles and herself to get through the meeting.

48.

After the December 5, 2014,  meeting closed without a resolution,  Ms. Sutton and Ms. Mukherjee decided they needed to speak with each of the complainants individually which would happen after the first of the year.

49.

In January 2015 Ms Skains had her meeting with administrative personnel., Ms. Sutton and Ms. Mukherjee.  At its conclusion Ms. Skains requested a written response as required by Employee Handbook rules.  Ms. Sutton sent her and Plaintiffs a memo advising them "all of the particulars were being considered" relative to their complaint, and "yes there has been progress

and you will be contacted when we are finished investigating your concerns."

50.

On February 16, 2015, Ms. Mukherjee sent Tiffany Snyder an email advising that she and Ms. Sutton and Chris Kirkley would like to meet with her on February 19th to discuss the issues raised at the December 5th meeting.  Ms. Snyder agreed to meet but asked that Chris Kirkley not be present.

51.

Ms. Snyder met with administrative personnel on February 19, 2015.  Mr. Kirkley remained in the room despite her request that he leave.

52.

On March 9, 2015, Pamela Charles received an email from Ms. Mukherjee asking that she meet with her and Deonci Sutton and Chris Kirkley on March 12, 2015 to discuss issues raised at the December 5th meeting.

53.

On May 26, 2015, Catherine Dyas received an email from Ms Mukherjee asking that she meet with her, Mr. Kirkley and Deonci Sutton on May 27, 2015, to discuss issues raised at the December 5, 2014 meeting.

54.

On July 16, 2015, Deonci Sutton sends out a memo to "All Users" announcing the hiring of John Tuggle as the new Executive Director replacing the former Executive Director Dr. Ronald Heezen who announced his resignation in August 2014 and officially left January 31, 2015.

55.

During the summer months of 2015 plaintiffs received no responses with regard to their December 2014 complaints.  The hostile work environment worsened.  Jennie Paxton operated as Director, Financial head and Human Resources Director in the interim.

56.

On September 15, 2015, Chris Kirkley gave Tiffany Snyder a written warning for being unprofessional and for insubordination.  On September 23, Ms. Mukherjee signed off endorsing Kirkley's reprimand.

57.

On September 29, 2015, Tiffany appealed her reprimand claiming the facts as stated were not true and pointing to her seven years of exemplary service to the Library with only positive evaluations.

58.

On October 27, 2015 Chris Kirkley falsely accused all three of the plaintiffs of taking unauthorized breaks.

59.

On November 4, 2015 Tiffany Snyder's grievance filed in October challenging the September reprimand resulted in a downgrade from insubordination to unprofessional behavior.  Ms. Snyder continued to grievance Step 3.

60.

On November 17, 2015, all three plaintiffs received an email informing them that an investigation would be conducted by an "outsider," Gayle Godfrey, and that they would each be

required to have a brief interview with her.

61.

On November 17, 2015, Chris Kirkley sent all HSCB employees a schedule of a workplace investigation.  Sixteen employees were to have a 30 minute interview; two department managers, an Assistant Branch Manager and the Branch manager and the Area Manager were all scheduled for a 60 minute interview.  Kirkley emphasized the investigation required their cooperation and a signed agreement of confidentiality from each of them.

62.

The interviews took place November 18-20, 2015.  Each person interviewed was told that she would ask everyone a the HSCB the same 10 questions; she would then summarize their responses and present them to the Library administration.

63.

Based on plaintiffs' interviews, <u>no</u> questions were asked  about a hostile work environment created by Chris Kirkley's inappropriate behavior with Tiffany Snyder.  No questions were asked about a  hostile work environment experienced by all three plaintiffs and many of their co-workers including Assistant Manager Barbara Skains because of their branch manager's behavior.

64.

The questions that <u>were</u>  asked by the investigator focused on whether the black supervisors (Ms. Charles and Ms. Snyder) treated their white subordinates improperly.

65.

On November 23, 2015, Regional manager Bandana Mukherjee and Chris Kirkley each

signed off on Ms Snyder's disciplinary action in accord with Ms. Sutton's modifications.  This was the first discipline in Ms. Snyder's file since she hired on seven years earlier.

66.

On January 4, 2016, Executive Director Tuggle released a letter in response to the "pending and unresolved complaints and investigation." dating back to the Fall of 2014.

67.

While the Shreve Memorial Library system has been rife with complaints and formal grievances of racial discrimination for at least the last three administration of Directors Pelton, Heesen and now Tuggle, those complaints had not come from employees at the Hamilton/South Caddo Branch.

## THE RETALIATION ISSUE

68.

It was not until Chris Kirkley joined  Annie Harville at the HSCB, that racial issues were ever mentioned at the HSCB.  Former branch manager Catherine Beard had found no racial issues during her tenure as branch manager at the HSCB.  Barbara Skains performing her job as assistant branch manager under both Catherine Beard and then under Chris Kirkley found no racial problems at the HSCB prior to the appearance of Chris Kirkley.

69.

Despite the absence of grievances based on racial discrimination, the long-awaited report announced by John Tuggle on January 4, 2016, began by referring to the "two allegations of racial discrimination at the HSCB in the last two years."

70.

The January 4, 2016, report continued:    Bandara Mukherjee and Deonci Sutton investigated the first allegations of 2014.  Gale Godfrey investigated the allegations of November 2015.  Neither investigation found racially discriminatory behavior on the part of any staff member at HSCB.  The issue of sexual harassment and hostile work environment created by Chris Kirkley was never mentioned in the report.

71.

What Director Tuggle failed to consider was the administration's response to Barbara Skains' assistance to the three plaintiffs who had consistently been complaining about a hostile work environment due to the sexual harassment of Tiffany Snyder and her two black co-workers Pamela Charles and Catherine Dyas.  On November 20, 2014, Barbara Skains was unexpectedly called to the main office to meet with Deonci Sutton and Chris Kirkley.  She was lead to believe the purpose of the meeting was for the three participants to discuss how they could improve the branch and "strengthen her role as assistant branch manager."  As it turned out, she felt she was instead blind sided with a disciplinary meeting during which her performance was scrutinized and critiqued.  Until she had begun supporting Tiffany Snyder in her disputes with Chris Kirkley, Ms. Skains had been told her performance was exemplary.  Retaliation had begun.

72.

On Sunday, November 30, 2014, Barbara Skains was working the public service desk in the Tech Center when Annie Harville came up to her asking if she was okay.  Ms. Skains had no idea why she would ask such a question as she hadn't seen anyone from HSCB since her meeting of Nov. 20th due to a previously scheduled vacation.  Ms. Harville went on to say that she felt

Tiffany Snyder enjoyed the attention from Chris Kirkley and encouraged it. She felt the changes Mr. Kirkley made at HSCB were for the good. Ms. Skains was puzzled as to how Ms. Harville had learned about that meeting which should have been confidential and why she would make those comments to her.

73.

What Director Tuggle did find in January of 2016, was a number of employees who were allegedly a "toxic group" acting as "de facto management" at the branch. He determined these five individuals needed to be moved away from the branch to other locations where they would no longer be in each other's work place.

74.

Those "toxic" employees were plaintiffs Catherine Dyas, Pamela Charles and Tiffany Snyder as well as Assistant Manager at HSCB Barbara Skains and Manager of HSBC Chris Kirkley. Each employee was assigned to a new position effective January 8, 2016.

75.

The outcry from the vast majority of staffers at the HSCB was loud and clear. The decision made by administrators had no valid basis and was destroying one of the strongest teams in the system (with the exception of its manager Chris Kirkley). Patrons of that branch joined in the outrage and appeared at the several meetings of the Board of Control which considered the issue.

76.

What Catherine Beard refused to do, and what Annie Harville couldn't do on her own, Chris Kirkley accomplished: the two black department supervisors were finally removed from

the predominantly white Hamilton/South Caddo Branch of the SML.

77.

The white members of the "toxic group" (Barbara Skains and Chris Kirkley) moved on to highly desirable jobs at the Main Branch in the historic downtown Branch with pay raises and numerous other "perks." The three black plaintiffs who were members of the so-called "toxic group" were removed from challenging and rewarding jobs in which they excelled and which they enjoyed to isolated spots where their presence is resented, their skills are wasted, and they are miserable.

78.

The reason for the action taken on January 6, 2016, by Director Tuggle has only one logical explanation: The three plaintiffs were being punished for the grievances and complaints they had filed over the years and their transfers were in retaliation for those actions.

79.

Public outcry was ignored by the administration and the Board of Control which ignored the many citizens who attended the Board meetings held to address the plaintiffs' appeals from the adverse employment actions.

80.

Plaintiffs contend the confidentiality requirements imposed by the Board and its administrators on all Library employees is a violation of their right to due process preventing them from even knowing who their accusers were and what the allegations against them might be.

81.

The only allegations "pending" were those focusing on Chris Kirkley and his sexual harassment of Tiffany Snyder which resulted in a hostile work environment for the three plaintiffs when Ms. Snyder made it clear she would tolerate no more of his "stalking of her" at her work place, his compulsive need to know her every movement, and his embarrassing attention to her which led to gossip not just at the HSCB but throughout the entire Library system.

82.

Evidence produced in discovery will support a finding that the Shreve Memorial Library has during the tenure of its last three Executive Directors been a system where racial discrimination clearly exists and continues unabated; where the rules established by the Board of Control as set forth in the Shreve Memorial Employee handbook in all of its iterations are ignored or enforced at the whim of Jennie Paxton and the director at the time; where talent and qualifications are a distant second in determining hiring and promoting Library personnel; where many of the most talented Library employees either voluntarily resign or are fired when they have challenged the toxic, system-wide, substandard and at times legally questionable operation of the Shreve Memorial Library System.

83.

There is a lengthy list of exemplary former employees of the Shreve Memorial Library who were subjected to the retaliatory methods of Jennie Paxton and the cabal she coordinated over the past ten years.  They are prepared and eager to step forward to testify on behalf of these plaintiffs and to produce records to support their testimony.

84.

Plaintiffs believe they were wrongfully removed from the jobs at which they excelled  at a branch where they were well-received by both the patrons and most of their co-workers merely because they were black and they were at a branch that was recently made a service center.

85.

Tiffany Snyder was subjected to sexual harassment because of her sex as defined under the law and jurisprudence.  After coming to her defense, Pamela Charles and Catherine Dyas also were subjected to the same sexual  discrimination.

86.

All three of the plaintiffs were forced to work in a hostile environment once Chris Kirkley realized Tiffany Snyder would no longer tolerate his sexual harassment and they were persistent in filing grievances against him.  The extent of the hostility was both subjectively and objectively hostile as those terms have been defined under the applicable statutes.

87.

The letter issued January 6, 2016, by  Executive Director Tuggle in response to a grievance initiated by the plaintiffs in the summer of 2014 makes it quite clear.  But for the plaintiffs' continuing complaints of mistreatment by Chris Kirkley, they would still be working at their positions at the HSCB.  But according to Executive Director Tuggle, their conduct somehow created  an "alternative level of administration" at the HSCB – a "de facto" administration of sorts.  For that reason, he said, they must be removed from the HSCB and banished to separate branches where they could no longer form such a "de facto" and toxic force.

88.

The source and perpetrator of the initial discriminatory treatment, Chris Kirkley, was ultimately rewarded with the position as branch manage of the crown jewel of the Shreve Memorial Library system, the Main Branch in downtown Shreveport.

89.

The white female who most definitely did come to the aid of the three plaintiffs, was nevertheless also rewarded with a promotion to an exempt position at the same Main Branch at which Chris Kirkley would be the manager.  Apparently the Executive Director saw no harm in the two white members of the "toxic quintet" who formed a part of the "de facto administration" remaining at the same branch.

90.

Plaintiff Catherine Dyas was moved to the Mooretown Branch with a title as meaningless as the branch itself.  It is a little used, badly maintained both in its structure and in the services provided, and staffed by personnel whose main activity is bickering among one another and trying to find a way out of that branch.  Ms. Dyas has lost the flexibility to work shifts which allow her to keep a second job and she can no longer work the Sunday hours at the HSCB where she is known and admired.  She suffers deeply from depression as well as  physically as a result of the adverse actions taken against her.

91.

Tiffany Snyder was transferred to the Cedar Grove Branch where the Children's Dept. Supervisor spot had long been vacant.  It is a dead end position that no one wants.  She is alone in the Department with no one to supervise as she had at HSCB and no funds to use to make a

difference. She is depressed and in need of mental health therapy to help her overcome what really is post traumatic stress disorder.

92.

Pamela Charles has the same title she had at HSCB now that she is at the Broadmoor Service enter Branch. But at her new assignment she doesn't have a separate office and she is not well received by her co-workers. One of her subordinates had been employed with the Shreve Memorial Library for forty years. The day Ms. Charles was introduced as the new Circulation Department Supervisor, he turned in his resignation with the explanation that he always knew God would let him know when it was time for him to retire, and he got that message today. Upper management at her new branch gives her no support when employees in her department fail to appear for work or come in late on a regular basis. No one seems to care about the rules nor will they support her as she attempts to excel in her new position. Thee is no other black supervisor at the service center in the white neighborhood. She is basically ostracized from the other employees. Many of the patrons will pass her by and wait for one of the white employees rather than let her assist them. Her name wasn't even listed as the new Circulation Dept. Supervisor at the Bradmoor Service Center Branch when all the rest of the changes were announced–even though her replacement at the HSCB was listed. It seems obvious this placement is meant to punish Ms. Charles for having been so persistent in filing grievances. Ms. Charles suffers from both physical and mental health problems due to the stress of the past several years.

93.

The actions of the individuals named as defendants and described herein were done in

bad faith, maliciously, and with deliberate indifference to the plaintiffs' protected rights, and with callous and reckless disregard for the same.  Awards of punitive damages against each individual are thus warranted.

WHEREFORE,  plaintiffs request the following relief against the defendants jointly, severally and *in solido:*

A.   Judgment declaring that the defendants, individually and /or in conspiracy, violated the statutory and constitutional provisions, both state and federal, alleged herein;

B.   That this Court order the plaintiffs be awarded all compensatory damages to which they are entitled, all punitive damages allowable, and any other relief to which they may be entitled;

C.  The plaintiffs be provided a trial by jury for those matters so triable.


Respectfully submitted,

GILLEY & GILLEY
820 Jordan Street, Suite 206
Post Office Box 52011
Shreveport, LA 71135-2011
Telephone: 318 226-4989
Facsimile: 318 226-4502
Email: patriciadordangilley@gmail.com


BY: /s/ Patricia A. Gilley
        PATRICIA A. GILLEY
        Attorney for the plaintiffs
        LA Bar No. 06215